ATTORNEY GENERAL *vs.* ALPHONSO TARR & others.

Essex.    November 8, 9, 1888. — January 4, 1889.

Present: MORTON, C. J., FIELD, DEVENS, C. ALLEN, & KNOWLTON, JJ.

*Common Landing Place — Reservation — Acceptance — Obstructions — Public Nuisance — Information by Attorney General — Custom.*

The reservation of a landing-place "for the public use for the inhabitants of G."
  is for the benefit of the public generally, and an acceptance thereof, if neces-
  sary, is shown by the use by the public, or by a particular class thereof, of all
  portions of such landing, either for purposes of labor or recreation.
An information in equity in the name of the Attorney General will lie, at the rela-
  tion of persons interested, for the removal, as public nuisances, of permanent

structures erected within the limits of such a landing place, although standing on a part thereof not in general use.

Under the Province Charter, providing that fishermen might build on lands "lying waste, and not then possessed by particular proprietors, such wharves, stages, and work-houses" as might be necessary for the curing and packing of fish, structures in their nature permanent cannot be erected on such a landing place or on any part thereof.

The right cannot be acquired by custom to maintain a building or permanent structures upon such a landing place.

A ruling by a master, that such a structure was not also an encroachment upon a public way, in view of the fact that the way was never wrought, and its limits as laid out could not be defined, was *held* to be correct.

INFORMATION IN EQUITY, filed at the relation of certain inhabitants of Gloucester, in behalf of themselves and the rest of its inhabitants, for the removal of a building, and a wall in process of construction, placed by the defendants upon a common landing place in that city. Hearing, upon the pleadings and exceptions alleged by the plaintiff to the report of a master, to whom the case was referred, before *Morton*, C. J., who sustained the exceptions, and ordered a decree to be entered for the plaintiff; and the defendants appealed to the full court. The facts appear in the opinion.

*W. O. Underwood*, for the plaintiff.

*D. O. Allen*, for the defendants.

DEVENS, J. This information, filed by the Attorney General, prays relief against the defendants, upon the ground that they have erected and are proceeding to erect certain structures upon a common and public landing place which are a nuisance thereto at common law and within the meaning of the Pub. Sts. c. 54, § 1. The defendants do not seek to justify the continuance of these structures as having been maintained for forty years. They deny that the locus upon which the structures are now erected, or are being erected, is a common landing place, or that they interfere with any rights of the public or the inhabitants of Gloucester therein. They assert also that they have a right to erect and maintain them under the Province Charter of 1692.

It will not be here important to determine the exact boundaries of the entire locus which the plaintiff claims as a landing place, and concerning which there was much evidence before the master, as the structures complained of are clearly within them, however those boundaries may be defined. The early allot-

ments of land were made at Cape Ann, now Gloucester, by committees appointed by the General Court, it having been established in 1639 as a fishing plantation. 1 Mass. Col. Rec. 256, 339. In the year 1642, it was recognized as a town by the name of Gloucester. 2 Mass. Col. Rec. 2. Its boundaries were settled, especially that between itself and Manchester. 1 Mass. Col. Rec. 339; 2 Mass. Col. Rec. 4; 4 Mass. Col. Rec., Part II. 504, 520.

While no act similar to our present acts of incorporation was passed until after the expiration of the colonial government, as it was doubted whether that government had authority to create municipal corporations, the towns and settlements which it organized can hardly be distinguished from those subsequently incorporated. They were subjected as such to taxes and assessments, to fines for failure to perform the duties imposed upon them, allowed to choose certain officers, and invested with many, perhaps all, of the most important municipal powers, until they thus grew to be in effect municipal corporations. *Porter* v. *Sullivan*, 7 Gray, 441. The private property or ownership of land within the limits of the Colony of Massachusetts Bay is derived from the colonial government. The lands were first granted by the crown to the Governor and Company of Massachusetts Bay in New England, and by them were parcelled out to individuals and to settlements or towns, and at a later period to distinct bodies of proprietors as tenants in common, with a view to their subsequent incorporation as a town. *Commonwealth* v. *Roxbury*, 9 Gray, 451.

Where there was no separate body of proprietors to whom the territory was granted, the town by its establishment became, as a general rule, the owner of the land within its assigned limits. " Its functions were then of a twofold nature : to distribute the lands among the freemen for the purposes of settlement, reserving such parts as might be deemed requisite for various public uses, and to do its part as a constituent member of the new state, bearing its proportion of the public burdens; clothed with limited powers of self-government in local matters, but amenable to the Commonwealth, and subject to its control and direction." *West Roxbury* v. *Stoddard*, 7 Allen, 158. It was never doubted that the boundaries of towns might be changed, or

that, as they were organized for public purposes, they might be required to devote any land or territory granted to them (which had not been granted to private persons) to such uses as the Legislature might thereafter by law designate. *West Roxbury* v. *Stoddard*, 7 Allen, 158. *Boston* v. *Richardson*, 13 Allen, 146, 150. Act of March 3, 1635-6, § 3, 1 Mass. Col. Rec. 172.

That the town of Gloucester had authority to set apart and reserve for public use the locus as to which the dispute arises, and that it did so, — without at this moment considering the language of the reservation, — fully appears by the report of the master. There was no separate organization of the commoners of Gloucester. After it was recognized as a town, allotments appear to have been made by votes in town meeting. While a book called the Commoners' Records was produced at the hearing before the master, it was in the nature of a book of possessions, showing the action of the committees of the town under the authority of these votes, but containing no record of any vote or corporate action by the commoners as such. A vote was passed at a town meeting held in Gloucester on June 16, 1707, by which a committee of nine was appointed to lay out to the inhabitants certain of the common and undivided lands as they might deem for the public or private good. A tract of land was laid out for John Stone by this committee, which is found in the so-called Commoners' Records under the date of October 21, 1707. This laying out contains the reservation of the locus in question; after stating the boundaries of the land laid out to Stone, it adds, "and all the common land on the western side of the above said line is left and reserved free for landing places for the public use for the inhabitants of Gloucester forever, by order of the committee."

As found in the Commoners' Records, this laying out is signed by only three of the committee, but it purports to be the act of the committee and done by its order, and it may be that the three signatures are intended only as an authentication of the record, especially as it appears that many similar entries in the book are of this character. This is, however, of little importance, as the subsequent votes in town meeting show that the action taken was fully assented to and ratified as that of the committee. The reservation of these premises for landing

places was, therefore, a public declaration of the town having authority to dispose of these lands, in the absence of any special grant or appropriation by the authorities of the Colony or Province, that the premises were set apart " for the public use for the inhabitants of Gloucester," and reserved from being granted to any individual proprietor.

The language of this reservation is peculiar, and the suggestion is made, that the words " for the public use " are qualified by those which follow ; that all which it was intended to reserve was a landing place or landing places for the use of the inhabitants of Gloucester only; and that therefore, assuming that the structures complained of are wrongfully maintained on the tract, no injury is done to the general public which can be remedied by any public proceeding at the suit of the Attorney General, but a private injury only, to be remedied by a proceeding commenced and conducted by the city of Gloucester as a corporation, or the inhabitants thereof, both of whom are definite bodies amply competent to maintain their own rights. It is true, as a general proposition, that it is only in case of a public wrong, where each citizen of the State is interested, that it can be redressed by a public prosecution or proceeding. *Attorney General* v. *Salem*, 103 Mass. 138. We think that principle does not here apply.

The statute (Pub. Sts. c. 54, § 1), has provided that, where boundaries of tracts similar to that in question can be made certain, " no length of time, less than forty years, shall justify the continuance of a fence or building on a town way, private way, highway, training field, burying place, landing place, or other land appropriated for the general use or convenience of the inhabitants of the Commonwealth, or of a county, town, or parish; but the same may upon the presentment of a grand jury be removed as a nuisance." The Legislature has, therefore, treated an intrusion of this character upon a landing place, when laid out for the general use and convenience of the inhabitants of a particular town, as a public nuisance, to be remedied by the presentment of the grand jury. Even if a way be but a private way, and such a one as a town may possess as incidental to the possession of its property, if it be appropriated to the general use and convenience of the inhabitants of a town, an intrusion upon

it may be thus dealt with. *Deerfield* v. *Connecticut River Railroad*, 144 Mass. 325. If a public prosecution of a criminal character may be adopted for the purpose of redressing such a grievance, there can be no reason why the Attorney General, representing the public, and acting at the instance of relators who are interested, may not initiate a civil proceeding similar to that adopted in the case at bar, when such is for any reason found to be more convenient and appropriate.

We are not, however, disposed to adopt so narrow a construction as that which would hold that the reservation should be construed as one for the benefit of the inhabitants of Gloucester solely, nor is such the natural interpretation of its language. It has been often said, that the language of the votes of a town is not to be too critically scanned, and that, even if defectively expressed, where its meaning can be ascertained that will be followed. It was inconsistent to say that the landing place was "for the public use," if it was for the inhabitants of Gloucester only. When the word "and" is supplied between the two phrases, its meaning is seen to be that the reservation was alike for the public and the inhabitants of Gloucester. Even if the last clause is in one aspect superfluous, as they are a portion of the general public, it indicates those for whose use it is primarily and principally intended. There is nothing inconsistent or unusual in thus specifying those for whose more immediate benefit such an appropriation is made, while the public in general also acquire rights thereby.

Town ways are by the statute laid out by the town authorities "for the use of their respective towns." Without considering those cases where the county commissioners have jurisdiction in regard to them, such ways must be accepted by the respective towns, must be maintained by them, and may on proper proceedings be discontinued by them. Gen. Sts. c. 43, § 60. Pub. Sts. c. 49, § 65 *et seq.* While they exist, all persons, whether citizens of the town or not, have an equal right to use them, and are injured if they are wrongfully obstructed or destroyed. *Cragie* v. *Mellen*, 6 Mass. 7. *Monterey* v. *County Commissioners*, 7 Cush. 394. *Higginson* v. *Nahant*, 11 Allen, 530. In the view we take of the statute and of the form in which the land whereon the defendants' structures now stand was "left and reserved free

for landing places," the Attorney General may properly maintain this proceeding.

While the master properly held that by the action of the town the premises described in the bill were set apart to the public use, and reserved from being granted to any individual proprietor, he also held that no sufficient use of that part of the locus which was set apart for landing places where the defendants' structures are situated was shown, constituting an acceptance thereof, and that the defendants have not therefore encroached upon the public use unless it shall be held that the whole tract has been duly established as a landing place, as it was reserved. We are not prepared to hold that any acceptance was necessary on the part of the inhabitants of Gloucester, for whose benefit the reservation for landing places was principally designed, other than that which is inferred from the reservation itself.   The landing was certainly valuable and beneficial to the inhabitants, and the act by which it was appropriated to themselves and the public was done by themselves, through the votes of the town, recorded in the book of possessions kept by its authority, for the purpose of showing the grants made by the town as the proprietary of the lands within its limits, and termed Commoners' Records.   *Boston* v. *Richardson*, 13 Allen, 146.   A town might accept a dedication made by others for the benefit of its inhabitants, as of a town way, previous to the St. of 1846, c. 203, by its acceptance or acquiescence, or that of its agents acting within the scope of their authority.   *Hayden* v. *Stone*, 112 Mass. 346, 350.   When the dedication is made by itself, such acceptance is necessarily implied from the act of dedication.

But if any acceptance by the inhabitants or the public were necessary to be shown, the case affords ample evidence of a sufficient user of the tract to show that the whole was accepted as a landing place, and that the structures of the defendants are an intrusion thereon, even if they stand on a portion not in the most common and general use.   This user is to be considered in connection with the acts of the town to which we have already adverted, and with the fact that it has always been treated by the town as a landing place, and so termed in its votes, and that the very location of a lot to John Stone, where the reservation is found, is bounded on it as a landing place.   The tract as thus

originally defined has been encroached on by the location of a wharf on the southerly end thereof, on property now owned or possessed by a certain wharf association. A part of it was also sold, in 1823, to one Jonathan Knowlton, which part was rear land, the sale of which did not diminish the shore frontage.

The tract, as described in the information, excludes these encroachments or diminutions of the original location. It extends from north to south from the Manchester boundary of the town along the shore. It is in part sandy beach, which is at the northern extremity of the locus. This beach is partly within the limits of the town of Manchester, and the whole of it "has been continually and generally used, from a time beyond the memory of living witnesses to within comparatively a few years, as a public landing place for all purposes." The remainder of the shore is a rocky bank, unfit for the landing of boats in its natural condition. This part of the shore has not been so generally used, with the exception of a portion at the southern extremity, where the fishermen have prepared and constructed landing places known as "gutters," or openings let into the shore, which have been used by them for landing in their boats in the prosecution of their business. From the time of the construction of the last gutter, the use of the sandy beach at the northerly end has diminished. While the intermediate space between the beach at the northerly end and the gutters at the southerly end has never been in general use as a landing place, individual instances of landing at different points along the intermediate space were proved.

The character of the shore and the exposure to winds and waves render it impossible to land with safety, unless under favorable conditions, except at the beach or the gutters; but it is practicable to clear out the rocks at or near the defendants' building, and construct there a place for landing, as well as at the gutters. The distance from the southern boundary of the tract, as it now exists, to the north side of the north gutter, is approximately twelve rods; from this to the southern limit of the sandy beach is twenty rods, and from that to the northerly end of the beach, which is beyond the town line of Manchester, about eighteen rods. The southerly end of the sandy beach is some fifteen to twenty feet north of the buildings of the defend-

ants, and the wall as planned and partially constructed extends a short distance below the line of mean high water. In front of this wall there is a portion of smooth sandy bottom, but it would be unsafe for landing except at particular times of the tide and in calm weather. Of late years, parties going to the beach in Manchester for bathing or recreation have passed over the premises now occupied by the defendants, and within ten or twelve years some stone steps have been placed upon the bank, by which many persons descend to a path leading to the beach and the rocks. With this use of the steps and path, the defendants' structures interfere.

Previously to the erection of the defendants' building, the land on which it stands had been unoccupied, except from time to time by fishermen for drying fish on temporary fish flakes, and for spreading and drying nets. Landings had sometimes been made at or near the building, and goods brought in a dory had been carried up the bank near it, but whether actually over the spot occupied by the defendants' building did not appear. Sometimes visitors also came from the Manchester side of the cove to a cottage kept as a house of entertainment, near the defendants' building, and landed in the vicinity of the building. The whole intermediate space of upland between the sandy beach and gutters was occupied by fishermen, at their pleasure, " for their fish flakes, for depositing their fish and their fishing apparatus, and for the several purposes of their fishing business," and also for their fish-houses placed on this land and also on the land between the gutters.

Upon these facts, it was erroneously held by the master that the acceptance by the inhabitants or the public was limited to those parts of the land reserved which were in actual use strictly as landing places. Apparently the whole of the tract, certainly that part where the defendants' structures were erected, could have been fitted for and used for the actual landing of boats. If the whole was not needed for this, it might properly be devoted to those uses connected therewith, such as the drying of their nets and sails, or of their fish, by fishermen, so long as they did not thus interfere with such landing. The temporary and occasional landing at the intermediate space for pleasure or business showed also an acceptance of these as well as the other

parts of the landing. The use of a portion of the land reserved to pass to the other or Manchester part of the beach, or to descend the bank for pleasure or recreation, was also an appropriate use of the landing place, so long as it was consistent with the more immediate purpose for which it was designed. *Attorney General* v. *Woods*, 108 Mass. 436. *Attorney General* v. *Jamaica Pond Aqueduct*, 133 Mass. 361, 364.

The acceptance is to be construed in connection with the grant or dedication. Where that clearly includes the premises, less evidence must certainly be required to show that any particular part had been accepted, than where it is uncertain whether there has been more than a partial and limited dedication. As to every portion of the tract described in the information, there is some evidence at least of a public use; and when that which relates to the different parts is considered together and combined, it establishes an acceptance, if, as heretofore suggested, acceptance is necessary. Nor does the fact that most of the evidence relates to acts done by the fishermen in their use of this landing place limit the acceptance to them as a class. They avail themselves more particularly of the benefits of this appropriation of landing places, but they do so as a portion of the public, and their acceptance enures not only to their own benefit, but also to that of any portion of the public having lawful occasion to use and enjoy them.

The defendants claimed a right by custom to occupy the premises as they have done; but it was correctly held by the master, that a right by custom to maintain a building or permanent structure upon the land of another could not be acquired.

The master also finds, that no presently proposed use of the premises by the public as a landing place is shown which requires the removal of the building and wall complained of, and that they are not upon the present state of facts encroachments upon the rights of the public. Some use appears to have been made by the public of the premises actually occupied by the defendants, as by fishermen for drying their nets and by the public in passing and repassing. Apart from this, they are permanent structures, and, if permitted to remain, an absolute right to maintain them as against the public, and thus to diminish the value of its easement, may be acquired. Pub. Sts. c. 54,

§ 1. They cannot be claimed to be mere sheds or huts used for the immediate comfort of fishermen, or the temporary protection of their fish, which may be removed at the end of a fishing season, or which, if permitted to remain, will yet not lose their temporary character. As the invasion of a right, if submitted to on the one hand and persisted in on the other a sufficient length of time, may result in the extinction of the right, those whose right is thus threatened are not compelled to wait, before seeking a remedy, until actual damage has occurred. *Ware* v. *Allen*, 140 Mass. 513.

It was further held by the master, that, if the whole of the premises had become established as a common landing place, the right to occupy the same for a fishing business, in the manner the defendants have done under the Province Charter (3 W. & M.), remained to the fishermen as to those portions of the landing place not in present use or at present called for to be used as landing places for the public, and therefore that the building and wall of the defendants were not encroachments. The Colony Charter, after the granting part, contained a proviso that "these presents shall not in any manner enure or be taken to abridge, bar, or hinder any of our loving subjects whatsoever to use and exercise the trade of fishing upon that coast of New England in America mentioned in these presents to be granted." Fishermen were permitted to fish "where they have been wont," and "to build and set up upon the lands by these presents granted such wharves, stages, and work-houses as shall be necessary for the salting, drying, keeping, and packing up of their fish to be taken or gotten upon that coast." Anc. Chart. 16. It appears then to have been considered a common law right for fishermen to go upon adjoining lands to spread and dry their nets. Gould on Waters, § 100. The object of this reservation in the Colony Charter was not to grant any new rights to fishermen, but to protect all English subjects against any hostile colonial legislation, and in the exercise of the same rights as those to which the inhabitants of New England were entitled. This is shown by the legislation of the Colony in answer to complaints of inhabitants of intrusions upon their lands by fishermen, by which such intrusion was forbidden upon lands granted to the towns or possessed by individual proprietors. 3 Mass. Col. Rec. 63.

4 Mass. Col. Rec., Part II. 368. This construction was apparently accepted in the Province Charter, which confirms all grants theretofore made " by any General Court formerly held," or " by any other lawful right or title whatsoever," and by a proviso directs that the rights of English subjects to fish, etc. shall not be barred or abridged by the letters patent, nor their right " to build and set upon the lands within our said Province or Colony lying waste, and not then possessed by particular proprietors, such wharves, stages, and work-houses as shall be necessary for the salting, drying, keeping, and packing of their fish to be taken or gotten upon that coast, and to cut down and take such trees and other materials there growing or being upon any parts or places lying waste and not then in possession of particular proprietors." Anc. Chart. 27, 36.

Were the provisions of the Province Charter still to be treated as in full force and operation, there are several sufficient answers to the claim of the defendants. Apart from the fact that the grants made by the Colony were confirmed, and that those made to the towns were included within this provision, when, subsequent to the Province Charter, the town lawfully appropriated this tract to the purpose of a landing place, even if previously thereto it could have been deemed " lying waste," and " not possessed by any particular proprietors," it ceased to be of this character. It was then devoted to a definite and important public use, and the fact that a special part of it was not in immediate use, or of immediate necessity to the landing place as then enjoyed, did not render it waste land, any more than a public park is to be so considered. Again, even upon waste land no permanent structure could have been erected, the possession and occupation of which continuously would have established a right of property as against the owner of the soil. The structures contemplated by the Charter must have been temporary in their nature, and intended for an immediate use, notwithstanding wharves are spoken of.

But we are of opinion that no rights now exist in favor of fishermen by virtue of the clause in the Province Charter which we are considering. A proviso in the Charter which diminished the grant made by it, and thus derogated from it in favor of all English subjects, so far as it conferred any legal rights in

the estates of others, must have ceased to affect those who were no longer English subjects.  If the proviso or reservation in the Charter be treated as a grant, our own citizens cannot now have rights under it, to be enforced upon the property of others, any more than those who are now English subjects can claim that they have still the right to build huts, etc. on this landing place. The Constitution of the Commonwealth, c. 6, art. 6, provides : "All the laws which have heretofore been adopted, used and approved in the Province, Colony or State of Massachusetts Bay, and usually practised on in the courts of law, shall still remain and be in full force, until altered or repealed by the Legislature; such parts only excepted as are repugnant to the rights and liberties contained in this Constitution."

No authority has been found that recognizes any such right as that claimed by the defendants, even if it be held that the laws referred to apply to rights of British subjects under the Charter, nor can it be said that this reservation has been usually practised upon in courts of law as conferring the right now claimed. The fact that no such right, so far as our knowledge extends, has ever been asserted since the Revolution, is strong evidence that, even if the grant gave the authority claimed for it, the law conferring it was never adopted by the Commonwealth of Massachusetts.  The existence of such right would be directly in conflict with our legislation for the protection of highways, commons, and landing places, the easement of the public in which is equally entitled to protection with the property itself.

It was claimed also, on behalf of the plaintiff, that the structures of the defendants were encroachments upon a public highway, and in fact a highway was laid out by the town over a portion of the tract reserved for a landing place in 1710.  This highway does not appear to have ever been wrought, and in view of the fact that the master found it impossible, upon the evidence, to say whether the structures were within its limits, he correctly ruled that they could not be considered as encroachments upon it.                        *Decree affirmed.*