## LYDIA G. BROWN *v.* TOWN OF SUDBURY.

Middlesex, June, 1906.

*Colonial Grants — Land Tenure Under Colony and Province Laws — Common Lands — Towns and Proprietors — Proprietors of Common Lands and Proprietors of General Fields — Reservation and Exception.*

This is a petition under Revised Laws, Chapter 182, Section 11, to determine the validity of an alleged reservation in a grant of a portion of the Lowance meadows in Sudbury by the Proprietors of the Common and Undivided Lands in Sudbury to one Pitts, dated December 6, 1715, in the following language: " Only the proprietors reserve forever convenient driftways to the above said Lowance meadows and gravel to mend the mill dam and the highways, as there shall be occasion."

The petitioner claims that the title to the Lowance meadows at the date of the above grant was in the Proprietors of Common and Undivided Lands as incorporated tenants in common; and that the language above quoted created a technical reservation which has now expired, either (a) because it was a reservation to tenants in common without the use of words of inheritance, or (b) because it was a reservation to a corporation which has now become extinct. The respondents assert (a) that the language in question recited or created an exception, in which case this court has no jurisdiction of the matter in this particular proceeding, or (b) that if it was a reservation it was a reservation which inured to the benefit of the inhabitants of the town, or (c) that in whatever form it arose the right has been

acquired by the town by user to take gravel from the land
in question for mending the roads.

On November 20, 1637, the General Court of Massachu-
setts Bay Colony resolved, on a petition from " a great part
of the chief inhabitants of Watertown " that for want of
meadow they might have leave to remove and settle their
plantation upon the river which runs to Concord, that the
petition be granted; and that Lt. Willard with four others
should view the places on the river and set out a place there
by marks and bounds sufficient for fifty or sixty families.
And it was further ordered that after the place was set out,
the petitioners " or any such other freemen as shall join
them " should have the power to order the situation of the
town and the proportioning of lots, and " all other liberties
as other towns have; " and, finally, that " the said persons
appointed to set out the said plantation are directed so to
set out the same that there may be 1500 acres of meadow
allowed to it, if it be there to be had, for the use of the
town." Colony Records, Vol. I, (*) Page 207. At a Gen-
eral Court on September 6, 1638, it was resolved in regard
to this undertaking that " the petitioners Mr. Pendleton,
Mr. Noyes, Mr. Brown and Compa, are allowed to go on
in their plantation and such as are associated with them."
Colony Records, Vol. I, * Page 229. On September 4, 1639,
at a General Court it was ordered that " the new plantation
by Concord shall be called Sudbury," and that upon the
petition of the inhabitants of Sudbury, Peter Noyes and
other persons named " have permission to lay out lands to
the present inhabitants." Colony Records, Vol. I, * Page
259.

In the original settlement of the Massachusetts Bay Col-
ony two kinds of land tenure are to be found, the individual
and the communal. On the one side were the individual
adventurers pushing forward to the frontier in individual
holdings, and on the other, caused by the necessity of having

some common base for supplies, communication and protection, were the small settlements where the holdings were partly individual and partly common. This community interest was one of necessity only, and seldom extended beyond the necessity from which it arose. The underlying spirit of the enterprise was that of individual action, individual liberty and individual ownership. The grants to individuals were from the beginning grants in fee. Feoffees of Ipswich v. Andrews, 8 Met. 584; Colony Records, Vol. I, * 21; Colony Records, Vol. V, * 472. Grants to individuals, of territory to be developed as an individual holding as distinguished from a projected town settlement, were grants to them in fee as tenants in common. Higbee v. Rice, 5 Mass. 343. Where grants were made for the purpose of starting a new settlement, like this of Sudbury, the grants were usually (like a modern special charter) to certain named individuals, and to such others as should within given conditions join them in their enterprise. Where grants were made for the further enlargement of an already existing settlement, the grant generally ran to the town. See Atty. Gen. v. Tarr, 148 Mass. 311.

In the early days of the Colony the inhabitants of a town, whether for land owning, church going or strictly municipal purposes, formed practically one organization; but as time went on it became neither necessary nor desirable that all of the inhabitants of the town should have equal privileges in voting, in the common lands, or in the property of the parish. At first all meetings were simply meetings of the inhabitants, and any action taken by the " proprietors," by the " parish," or by the " town " was taken at one and the same meeting. The respondents in this case contend that the " proprietors " was practically the landholding corporate phase of the community, while the " town " was the governing corporate phase of the same community; that the title and ownership of one was practically the title and owner-

ship of the other; and that a reservation to either was a reservation to the inhabitants of the town. While the " inhabitants " and the " proprietors " in the early days were often the same people as a matter of fact, they differed nevertheless very radically as a matter of law. At first, as was to be expected, there was little distinction between them in the statutes, as there was even less distinction between them in fact. In 1643 it was provided that " where the commoners can not agree about the manner of improvement of their field then such persons in the several towns as are deputed to order the prudential affairs thereof, shall order the same, or in case where no such are, then the major part of the freemen." Colony Records, Vol. II * Page 37. But, although alike in their origin, and not only similar but identical in their early management, the two incorporated forms of town life were very dissimilar in their purpose, and in the nature of their legal title to property. The one was a permanent communal corporation, the other a temporary and self-disintegrating body. The one was formed to live, the other was expressly formed to die. Strong, J., in Monumoi v. Rogers, 1 Mass. 159, 164. When in 1692 power to manage, divide and dispose of common lands was given to the major part of the " proprietors," the provisions therefor were passed as part of a general act " for regulating of townships, choice of town officers, and setting forth their powers." Province Laws, Act of 1692, Chapter 28. Meantime in 1660 it had been ordered that thereafter " no cottage or dwelling place shall be admitted to the privilege of commonage for wood, timber and herbage, or any other the privileges that lie in common in any town or peculiar, but such as are in being or hereafter shall be erected by the consent of the town." Colony Records, Vol. IV * Page 337. (Note — Some of the towns had passed orders to this effect as early as 1632. See an article by Prof. Beale in the Green Bag for June, 1907.) In 1679 towns had been au-

thorized to dispose of their lands by action of a majority of the freemen. Ancient Charters (ed. 1814) Page 195. In 1692 provision was made for the organization of towns and the regulation of the duties of town officials, while the administration of common lands was transferred to the "proprietors." An. Charters (ed. 1814) Page 247. In 1694 the separate corporate character of the proprietors was recognized, and provision was made that both towns and proprietors of common lands might sue and be sued. Province Laws, Acts of 1694, Chapter 15; An. Charters, Page 279. In 1698 provision was made for calling meetings of the proprietors. Province Laws, Acts of 1698, Chapter 12; An. Charters, Page 320.

Thereafter each body held its separate meetings and kept its separate records. Title in each case was a corporate title in so far as each body had certain corporate powers, including those of management, the right to sue, and the power of division and alienation by vote; but in the case of a town the title was that of a fee in the municipal corporation, while in the case of proprietors of common lands the title remained in the several proprietaries as tenants in common, although subject to be divided, lessened or defeased by statutory action of the majority. Monumoi v. Rogers, 1 Mass. 159; Mitchell v. Starbuck, 10 Mass. 5; Bott v. Perley, 11 Mass. 169; Springfield v. Miller, 12 Mass. 415; Worcester v. Eaton, 13 Mass. 369; Jeffries Neck Props. v. Ipswich, 153 Mass. 42. The only case which seems to make to the contrary is that of Tappan v. Burnham. At first sight this seems to support the contention of the respondents. In that case on petition of the inhabitants of Salem to have land at Jeffries Creek to erect a village there, there was a grant to certain individuals "and Compa." The court found that this was a grant to a proprietary, having certain corporate powers, which subsequently by usage or express grant became enlarged into full municipal authority. The decision

expressly rests on the authority of Commonwealth v. Roxbury.  "This was the construction put on a similar vote of the General Court in Commonwealth v. Roxbury."  But in Commonwealth v. Roxbury the grant was a grant to the "town of Roxbury."  Neither the distinction between a grant to individual proprietors and a grant to a town direct, nor the distinction between the incorporated proprietors of common lands and the incorporated municipality was in any way considered in Tappan v. Burnham.  For anything that appears in that case there may have been as in other towns, and indeed as is suggested by the court in its opinion, a transfer of title from the " proprietary having certain corporate powers . . . by express grant . . . to the full municipality."  Tappan v. Burnham, 8 Allen, 65, 71;  Commonwealth v. Roxbury, 9 Gray, 451, 496.

The " Proprietors of General Fields " was a different sort of corporation created by Act of February 24, 1786, which provided for the organization of the proprietors of individual lots lying in one common enclosure.  Originally the holders of such lots were the same people, living in the common village, holding their properties by the same titles, and governing themselves and all of their affairs at the same meetings, and by the same statutes, as their neighbors in the common life of the community.  The ordering of the common fields, like that of the undivided lands, was at first given by one statute to the selectmen.  Colony Records, Vol. II, * Page 37.  Later the matters of fencing and improving the individual fields maintained within one common enclosure, was made the subject of separate legislation.  An. Charters, pages 320, 420, 464, 600, 618;  Province Laws: 1698, Chapter 12;  1718, Chapter 3;  1727-28, Chapter 13; (and see 1727, Chapter 9, regulating Proprietors of Common and Undivided Lands);  1753-54, Chapter 29;  1758, Chapter 33.  As the common life began to disappear before the individual ownership, provision was also made for the

dissolution of these common enclosures. An. Charters, Page 321; Acts of 1698, Chapter 12 ad fin; Mansfield v. Hawkes, 14 Mass. 439. And finally, like the proprietors of pews, and wharves, and other individual owners banded together for certain common purposes, the proprietors of a general field were authorized to form themselves into a modern corporation. Acts of 1785, Chapter 53. But these proprietors of general fields, owning in severalty though in common enclosure, have nothing to do with the Proprietors of Common and Undivided Lands, holding their undivided shares as tenants in common.

As time went on the undivided lands grew less and less in quantity, while the individual inhabitants of the town, either holding in severalty or not holding land at all, increased in number. Thus the purposes, needs, powers and ownership of the proprietors of the common lands became not only distinct, but in some cases adverse, to those of the town. Jeffries Neck Props. v. Ipswich, 153 Mass. 43. In most cases the proprietors eventually divided all of their lands, and the corporation died its natural death. In some cases the proprietors conveyed their few remaining rights of property to the town itself. Commonwealth v. Bailey, 13 Allen, 541, 543. In at least one case, that of Salisbury, it is claimed that the ancient proprietors organization is still alive and holds title to lands adversely to the claims of the town.

In the case at bar, as in the case of most towns, the proprietors records were kept with those of the town, and to some extent in the same book. The lands of " proprietors " were often disposed of, as a matter of common conveyancing knowledge, at meetings which according to the wording of the records were " town meetings." It is claimed that the same fact obtained in Sudbury. I am unable to sufficiently decipher the old volume of records to judge of the matter, but it is immaterial. There was a period when separate

proprietors meetings were held and separate proprietors records were kept, and during this period the grant in question of December 6, 1715 to Pitts was made. The argument urged by the respondents that this land was town land; and that the reservation was made to the inhabitants, is not supported by the evidence, and cannot be maintained in the face of the Pitts grant. The ancient vote of the proprietors making the grant, is itself prima facie evidence of title. Springfield v. Miller, 12 Mass. 414; Gloucester v. Gaffney, 8 Allen, 11; Jeffries Neck Props. v. Ipswich, 153 Mass. 42.

If this was a reservation it was a reservation to the grantor, the proprietors of common lands, and not to the inhabitants, who are the present respondents. The absence of words of inheritance is not material. The original statute of 1651 requiring the use of the word " heirs " in granting a fee, as explained by the Act of 1684, was " intended for the direction of private persons only, in their particular deeds and conveyances of land from one to another." Colony Records, Vol. IV * Page 35; Colony Records, Vol. V * Page 472. Commonwealth v. Roxbury, 9 Gray 451, 466. It did not affect a grant from or to a public body, and in the grant to Pitts the Commoners though holding individually as tenants in common were granting in their corporate capacity, and such also was the reservation to them, if reservation it was.

But was it a reservation? Could it have been so intended by the parties? The alleged reservation was of driftways to the meadow, and gravel for mending the mill-dam and highways. With the two latter matters (and we are concerned only with the last) the Proprietors had nothing to do. The mill site had been already granted by the town (January 7, 1659) to a private individual, though with a provision apparently for the benefit of the inhabitants in general, as to grinding the town's corn. Sudbury Records, Vol. I, Page 65. It is claimed by the respondents that the lan-

guage now in question constitutes not a reservation, but an exception. The town authorities had a right by statute to take gravel from any land not planted or inclosed. Acts of 1693, Chapter 6; An. Charters (ed. 1814) Page 267. The respondents argue that this necessarily included the lands in question. This property has contained not only a gravel bank for over fifty years but the only gravel bank available for mending roads in that part of the town. For over fifty years the town authorities have continually taken gravel from it for mending the roads. For over twenty-five years the owner of the mill privilege has taken gravel from it, under a claim of right founded on his title deeds, for mending the mill-dam. So far as a claim by adverse possession is concerned, it has nothing to do with the present proceedings. Such a right, even if it has been acquired by the owner of the mill site, would not be in any way inconsistent, either with the right claimed by the respondent, or with the contention of the petitioner that the provision in question was a now expired reservation. Moreover, the evidence does not tend to establish a right by prescription in the town. Jeffries Neck Props. v. Ipswich, 153 Mass. 42-46.

I am of opinion that the provision in question was really an attempted reservation in favor of third parties. Perhaps enough can properly be inferred as to the existing state of affairs in 1715 to equally well warrant the conclusion that the clause should be construed as an exception. Whether it was an exception or an attempted reservation in favor of strangers to the deed, is however immaterial to this case, provided it was not a "reservation." As I construe it, it was not a reservation.

Decree accordingly.

C. H. Sprague, E. W. Crawford for petitioner.
C. Q. Tirrell, F. F. Gerry for respondent.