Rockingham,
No. 4717.

HAMPTON *v.* RICHARD PALMER & a.

Argued May 5, 1959.

Decided June 30, 1959.

*Perkins & Holland, Upton, Sanders & Upton* and *Wesley E. Whitney* (*Mr. Robert W. Upton* orally), for the plaintiff.

*Burns, Bryant & Hinchey* (*Mr. Bryant* orally), for the defendants.

BLANDIN, J. The issues presented are whether there was evidence to support the Trial Court's conclusion that the town of Hampton has title and holds in a governmental capacity the Fish House Area, so-called, located at North Beach in the township. The disputed plot, with the buildings upon it, consists of about an acre, bounded easterly by the Atlantic Ocean, southerly by the United States Coast Guard property, westerly by the Ocean Boulevard, and northerly by the land of Alfred K. Nason.

New England was settled under royal grants. *Concord Co.* v. *Robertson*, 66 N. H. 1, 6-7. It appears that the title to the plot as well as to all the area claimed by England and located in what was originally called the New World, was vested in the King. In 1606, King James I, by royal patents, created two colonizing companies, one of which became known as the London and the other — which concerns us — as the Plymouth Company. In 1621, the Plymouth Company was merged in the Council of Plymouth by patent issued by King Charles I to forty grantees, their heirs and assigns forever, "for the planting, ruling, ordering and governing of New England in America" within a vast territory lying between latitude 40 and 48 from sea to sea. The settling of New England, except for the Plymouth Colony founded by the Pilgrims, lagged, and in 1628 the Council granted to a group consisting of John Endicott and others as a body corporate known as the Massachusetts Bay Company, an area extending from three miles south of the Charles River to three miles north of the source of the Merrimack. The royal charter, recognizing that some agency was

needed to govern this vast territory once settlement was made, provided that the powers conferred by the charter be exercised by a governor and general court. This charter was liberally construed and formed the basis of the Commonwealth of Massachusetts for some fifty years.

After the family squabbles in England between Cromwell and the Crown had been resolved, the charter was annulled and Massachusetts became a crown colony in 1684. Meanwhile, on March 3, 1635, the General Court had, by an enactment, defined the powers of towns in broad terms, permitting the freemen of every town, or the major part of them, to have powers to dispose of their lands and woods, to grant lots and do all things necessary for the well being of their own towns.

In 1649, the General Court enlarged the governing bodies of the towns to permit the freemen, "with such others as are allowed," to have "the power to dispose of their own lands and woods, with all the privileges and appurtenances of the said towns, to grant lots, and also to choose their own particular officers . . . . " Colonial Laws of Mass. 1660, Whitmore *ed.*, 195. The General Court, in authorizing the establishment of towns, did not define their boundaries, which were often not set up for many years. The title to lands in towns or plantations, as they were sometimes called when first founded, was vested in the town as a legal entity. *Proprietors of Cornish* v. *Kenrick,* Smith 270, 274; *Cobleigh* v. *Young,* 15 N. H. 493, 502; *Commonwealth* v. *City of Roxbury,* 9 Gray 451 (75 Mass. 451, 486).

The town of Hampton, originally called Winnacunnet, was established by an act of the General Court in 1638, whereby Steven Bachiler and others were authorized to found a "plantation" which in 1639 became a town with power to choose officers and make orders for "the well ordering of their towne," and to lay out land. No boundaries then existed. In a dispute which culminated in proceedings before the King's Bench in 1677, the Court decided that Hampton was out of the bounds of Massachusetts. 1 Belknap's History, 170. However, this did not affect title to lands in Hampton which, with the exception of the portions granted away, remained in the town. *Willey* v. *Portsmouth,* 35 N. H. 303, 310; *Town of Hampton* v. *Locke,* 175 Briefs and Cases, 563, Memorandum of *Doe,* C. J.; see *Concord Co.* v. *Robertson,* 66 N. H. 1, 2, 9; *Beckman* v. *Hampton,* 74 N. H. 48, 49. It thus appears that the Court's finding that title to the land in Hampton

was vested originally in the town is proper and the defendants' exceptions thereto are overruled.

They contend that it is "unnecessary, however, to go back to the founding of Hampton in this case." They argue that if it ever did own any land, it ceased to own it upon the establishment of five divisions, title to which then vested in the proprietors rather than the town. According to the defendants, these divisions originally comprised a vast tract called the "Cow Common," set off at a meeting in 1645 and including all the land in Hampton, except some two hundred acres and a few plots already granted, the easterly boundary being the sea.

The Court has found against them on these claims, and since the findings and the rulings based thereon depend to a degree upon evidence to which the defendants excepted, we shall consider their contentions. Although the record is unclear as to whether all the exceptions, which the defendants have argued in their brief, were transferred, we treat them as though they were all properly before us. The evidence consisted of numerous exhibits which all fall in the same category, and therefore the exceptions to their admission may be disposed of without discussing each in detail. In general, they are records of actions taken at town meetings, covering many years, designed to improve and protect the beach bordering the Fish House Area, such as keeping horses off it except at stated seasons, forbidding the cutting of grass, directing the selectmen "to remove or cause to be removed those buildings on the town land near the fish houses," and forbidding the erection of structures within the area "except for strictly bathing purposes."

The materiality of this sort of evidence to show the exercise of dominion and control over the disputed property is apparent. Here also the town holding title to all the lands under the original grant had possession of them. *Dame* v. *Fernald*, 86 N. H. 468, 471. See also, *Cushing* v. *Miller*, 62 N. H. 517, 524.

The case of *South Hampton* v. *Fowler*, 52 N. H. 225, relied upon by the defendants as authority for excluding the exhibits, appears actually to support the plaintiff's position. There the court said that had there been some evidence of possession, "the testimony from the [town] records offered by the plaintiffs would also have been competent." *Id.*, 231. In the case before us, there was evidence of possession.

The exhibits offered were also competent to refute the defendants' claim that the town relinquished possession of the beach property

by grant or otherwise. The fact that some of the votes taken at the town meetings were in the form of ordinances goes only to the weight and not to the relevancy of the testimony, since the purpose of the ordinances was obviously to prevent appropriation of any part of the beach, as well as damage to it by individuals.

Furthermore, since the boundaries of the town were originally undefined, evidence was admissible to show over what area the town exercised dominion as bearing on the location of these boundaries. *Dame* v. *Fernald, supra.* Numerous references to "ye sea" as the eastern boundary are found in town votes, as well as in the action setting apart the "Ox Common" in 1641, to be a "common for oxen." The location of the boundaries was a question of fact to be determined by the Trial Court. *Brown* v. *Peaslee,* 69 N. H. 436. In reaching a determination, it was entitled to consider the evidence offered by the plaintiff and objected to by the defendants, and their exceptions to this class of evidence are overruled.

The defendants, in support of their position that the Cow Common included all the land in Hampton except that previously granted and that it extended to the sea, rely upon a number of arguments. One is that the "commoners," who they claim originally consisted of all male inhabitants of Hampton and who owned the land included in the Cow Common, often took votes relating only to commoners' property and affairs at a town meeting rather than at a separate commoners' meeting. When this occurred, the defendants say that often "unfortunately the books sometimes have reference to action of the town when in reality action was taken by the commoners." An examination of the exhibits discloses that the Court was not compelled to adopt this conclusion, and it could properly find from the records that the action was that of the town and not that of the commoners, and view it accordingly.

There is much evidence that after 1645 the town made numerous grants of land, indicating that it still retained possession of large tracts after the 1645 meeting. For example, at the meeting of November 18, 1700, it was voted that "a tract of land [be] layd out to those persons hereafter agreed upon," and then after describing the area, the resolution concluded: "All other land from that to the town [and] from Salisbury line to the sea shall *lay in common for the benefit of the Town of Hampton.*" (Emphasis supplied.) In this situation, the Court's finding that the

plaintiff retained certain lands after 1645 is clearly sustainable, and the defendants can take nothing by their exception to it.

It appears that of all the grants made by the town, the "Ox Common," so-called, and the "Cow Common," which together included the great marsh lying between Hampton River and what was known as the North Division, are the only ones which might reasonably be thought to cover the sandy beach wherein the Fish House Area lies. The Ox Common, first set apart in 1641 and later subdivided, consisted largely of the marsh and thatch land located between the Hampton River and pond near Great Boar's Head. The Cow Common included the marsh between Great Boar's Head and the North Division. The North Division was laid out in 1669. It was bounded by the sea. The First Division was one of several divisions carved out of the Cow Commons in 1721. It lay just south of the North Division, and its easterly boundary was not given. The defendants argue that it was a grant which included the Fish House Area. They assert that the North Division, to the north of the First Division, and the Ox Common, directly to the south of it, both extended to the sea. They argue that therefore the First Division, including the Fish House Area, must also have done so.

The boundaries of the First Division, when it was carved out of the Cow Common on March 20, 1721-2, did not include the sea, but described the property as beginning "att Benja Moultons Sen. & straight to Benja Lampreys Jun. and then north untill it comes to ye old North Division." In 1733, when the proprietors of the First Division disposed of a part of it known as "Huckleberry Flats," south of the Fish House Area, they did not purport to grant lots to the sea. It is reasonable to assume that had the sea been the easterly boundary, it would have been so stated. On October 31, 1749, the proprietors of the Ox Common allotted certain lots or shares "be laid out within ten rods of the sea bank." "That if the sea bank shall extend forder west ward, the shares shall draw back and keep that distance abovementioned." The return of the layout showed the easterly boundary of lands allotted to be "parallel with the Beach Keeping all ways ten Rod westly."

True, there was conflicting evidence as to the boundaries of the First Division, but it certainly cannot be said that all reasonable persons must consider it conclusive in favor of the defendants. It follows that the Court's finding that the easterly boundary of the First Division did not extend to the sea is supported by the record,

and the defendants' exception thereto and to the failure of the Court to grant certain requests for findings favorable to them relative to this issue, are overruled.

The Court found that the town had held the Fish House Area for common use for many years by commercial fishermen, farmers, fowlers and other inhabitants, and ruled that the property was owned in a governmental capacity. The defendants excepted to the finding on the ground that it was not supported by the record. Without detailing the voluminous evidence upon this point, it seems sufficient to summarize it by stating that there was much testimony to the effect that commercial fishermen, farmers in search of sea weed, and other inhabitants used the area in common for at least a century and a half. The importance of fishing to the early inhabitants was great, and the practice of setting apart common lands for fishermen's use was well established. *Attorney General* v. *Tarr*, 148 Mass. 309; *Lowell* v. *Boston*, 322 Mass. 709, 730. The character of the use and the methods generally adopted to transfer title of the buildings upon it from one owner to another are significant. Photographs and maps were introduced, the latter going as far back as 1806, showing that the locus was devoid of fences or boundaries, with the structures, which were often little more than shacks, often so close together as to leave only passways between them. The appearance was one of land open to common use. Until recently, the owners of the buildings made no claim to specific lots, nor did they attempt any division. The houses were set upon posts and were moved from time to time. Some witnesses stated that they never thought they owned the land, and there was evidence that no claim to it was made until recently to the selectmen. No tax was assessed on the structures as long as they were used for commercial fishing. Conveyances of alleged rights or title to the property were often evinced by simple memoranda of sale, by receipts or even by a mere change of possession. The informality of these transfers is more characteristic of dealings in personal property than in real estate and could be so viewed by the Court.

Throughout the period of its claim to ownership, the town has asserted its rights by imposing numerous restrictions on the use of the beach, designed, as previously indicated, to protect and improve it. On occasion, the town has removed buildings erected without its consent and has vindicated its claim to title by prosecuting and defending legal actions. In 1897 it sold part of

the Fish House Area to the United States Government for a Coast Guard station. The long-continued use of this land by the town raises a presumption of its legality. *Bow* v. *Allenstown,* 34 N. H. 351, 365; *Hoban* v. *Bucklin,* 88 N. H. 73, 88. In this situation, the burden was on the defendants to show a better title than the town in order to successfully maintain their claim. *Fowler* v. *Owen,* 68 N. H. 270. It cannot be said that all reasonable persons must agree that they have done so. In view of the nature of the use of the property and the actions of the town in regard to it, the Court's finding that it held in a governmental capacity is warranted. *Leary* v. *Manchester,* 91 N. H. 442, 445, 446; *Reynolds* v. *Nashua,* 93 N. H. 28.

The defendants' suggestion made in oral argument that the predecessors in title gained adverse possession prior to 1862 when RSA 477:34 originated in Laws of 1862, *c.* 2622, cannot prevail. The record would not support a finding of the open, notorious and exclusive possession held in derogation of the plaintiff's title essential to the defendants' claim. *Weeks* v. *Morin,* 85 N. H. 9; *Ucietowski* v. *Novak,* 102 N. H. 140.

The defendants finally urge that if it be held that the town owns the land, they are entitled to maintain their buildings for commercial fishing purposes. The Court has found, upon sufficient evidence, that they are not so maintaining them, and have not done so for many years.

It follows the order is

*Decree affirmed.*

WHEELER, J., did not sit; the others concurred.